Sealed



IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. **18-24223**

**CIV-GRAHAM**

The United States of America,
   and
The State of Florida, *ex rel.*
Lewis Eastlick, M.D.,

     Plaintiffs,

vs.                              **<u>FILED UNDER SEAL</u>**

**HCA, Inc.,
Kendall Healthcare Group, Ltd.
Burn and Reconstructive Centers of America, LLC., and
Burn Centers of Florida, Inc.**
     Defendants.

_____

1

2

I. Jurisdiction, Venue, and Parties ............................................................................ 3

II. The Law ................................................................................................................ 6

    A. The Federal and Florida False Claims Acts ................................................ 6

    B. Medicare and Medicaid ................................................................................ 7

III. Defendants' Fraudulent Conduct .......................................................................... 9

    A. Improper Trauma Center Referrals and Unnecessary Procedures ............. 9

    B. Improper Burn and Reconstructive Center Referrals and Procedures ..... 12

    C. Defendants Filed or Caused The Filing of False Claims .......................... 15

IV.        Counts ............................................................................................................. 16

    A. Submission of False Claims, 31 U.S.C. § 3729(a)(1)(A) ......................... 16

    B. Use of False Records of Statements, 31 U.S.C. § 3729(a)(1)(B) ............. 16

    C. Submission of False Claims Under Florida FCA, FSA. § 68.082(2)(a) .. 17

    D. Use of False Records or Statements, Fla. Stat. Ann. § 68.082(2)(b) ....... 17

Prayer for Relief ......................................................................................................... 17

## COMPLAINT

1. *Qui tam* Plaintiff Lewis Eastlick, M.D, by and through his attorneys, brings this Complaint on behalf of the United States and the State of Florida and on his own behalf, pursuant to 31 U.S.C. § 3730 of the Federal False Claims Act and the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq.*

### I. Jurisdiction, Venue, and Parties

2. This is an action for civil damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA") and the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq.* ("FFCA"). This court has subject matter jurisdiction pursuant to 31 U.S.C. §§ 3732(a) and (b) and supplemental jurisdiction pursuant to 28 U.S.C. § 1359. The court has personal jurisdiction over Defendant because Defendant transacts business and can be found in this district and Defendant committed acts within this district that violate 31 U.S.C. § 3729 as alleged herein.

3. Venue is proper in this district under 31 U.S.C. § 3732(a) because Defendant can be found in and transacts business in this district.

4. ***Qui Tam* Plaintiff Lewis Eastlick, M.D.** is Board Certified by American Board of Surgery in GS- Hand Surgery and practices medicine in Miami-Dade and Broward counties. Dr. Eastlick is an insider with respect to his knowledge of the scheme alleged herein.

5. With respect to each allegation herein made upon information and belief, Dr. Eastlick has, based upon his knowledge, data, and experience, a reasoned factual basis to make the allegation but lacks complete details of it. While Relator has significant evidence of the fraud alleged herein (the details of which follow), much of the documentary evidence necessary to prove the allegations in this Complaint is in the possession of Defendants, the United States, or Florida.

3

6. **Defendant HCA, Inc. ("HCA")** is a Delaware Corporation with its principal executive offices located at One Park Plaza, Nashville, Tennessee.

7. **Defendant Kendall Healthcare Group, Ltd.**, is a Florida limited partnership and has represented to the State of Florida that its principal place of business is One Park Plaza, Nashville, TN 37203. The general partner is Columbia Hospital Corp. of Kendall, located at the same address in Nashville, Tennessee. Kendall Healthcare Group, Ltd, does business as and owns the fictitious name "Kendall Regional Medical Center."

8. Defendant **Burn Centers of Florida, Inc.** is a foreign for-profit company authorized to transact business in Florida and based in Augusta, Georgia.

9. Defendant **Burn and Reconstructive Centers of America, LLC**, is a foreign LLC based in Augusta, Georgia and authorized to transact business in Florida. The LLC's manager is Robert Mullins, M.D.[

10. HCA is long familiar with the False Claims Act due to its history of paying fines, civil damages, and other penalties on account of past kickback violations and self–referrals.

- In July 2013, twenty-three hospitals affiliated with HCA agreed to pay $7,145,842 to settle allegations of false claims to Medicare for kyphoplasty procedures.
- In July 2013, HCA's Doctors Hospital of Augusta agreed to pay the United States over $1,020,000 to settle a whistleblower's allegations concerning false claims for radiation oncology procedures performed without the requisite physician supervision.
- In January 2013, HCA was ordered to pay $162 million for failing to abide by its agreement to improve dilapidated hospitals. *Health Care Found. of Greater Kansas City v. HM Acquisition LLC.*, No. 0916-CV30692 (Mo. Cir. Ct., Jackson County).
- In 2012, HCA agreed to pay $16.5 million for kickbacks paid to physicians. *United States ex rel. Bingham v. HCA*, No. 1:08-CV-71 (E.D. Tenn.).
- *U.S. et al. v. HCA et al.*, 8:12-cv-00734-JDW-TGW, closed 12/09/13. The docket shows the case was voluntarily dismissed, suggesting a settlement.

4

- In 2011, Medline Industries, Inc. agreed to pay $85 million to settle a whistleblower's allegations under the False Claims Act that the medical products company paid kickbacks to hospitals, including those owned by HCA.
- In *Simpson et al. v. HCA, Inc. et al., 8:10-cv-01580-EAK-TGW, closed 02/14/14 (M.D. Fla)* (dkt 17, p. 2), which was settled by HCA in 2014, the terms were concealed and not made part of the record.
- In May 2009, a whistleblower filed *Porter v. HCA Health Servs. of Oklahoma, Inc.*, No. 3:09cv992 (N.D. Tex.) for violations of the False Claims Act (resolution unknown).
- In 2008, a whistleblower filed *Hockett v. Columbia/HCA Healthcare Corp.*, No. 1:08cv22 (W.D. Va.) (filed 7/9/08) for violations of the False Claims Act.
- A whistleblower filed under the False Claims Act in *Lester v. Central Florida Reg'l Hosp.*, No. 6:08 cv1297 (M.D. Fla.).
- In 2007, a whistleblower filed *McLean v. Blue Cross Blue Shield of South Carolina*, No. 2:07cv9717 (E.D. La.) for violations of the False Claims Act (resolution unknown).
- In 2003, HCA Inc. (then known as Columbia/HCA and HCA - The Healthcare Company) agreed to pay the United States $631 million in civil penalties and damages. The government alleged that from the time Columbia Hospital Corporation was formed in 1987, many of HCA's hospitals engaged in a pattern and practice of paying kickbacks to physicians to induce and reward patient referrals. Cases resolved under the 2003 settlement included:

    - *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, No. 99-3302 (D.D.C.)
    - *U.S. ex rel. King v. Columbia/HCA Healthcare Corp.*, No. 99-306 (D.D.C.)
    - *U.S. ex rel. Mroz v. Columbia/HCA Healthcare Corp.*, No. 99-3292 (D.D.C.)
    - *U.S. ex rel. Alderson v. Columbia/HCA Healthcare Corp.*, No. 99-3290 (D.D.C.)
    - *U.S. ex rel. Schilling v. Columbia/HCA Healthcare Corp.*, No. 99-3289 (D.D.C.)
    - *U.S. ex rel. Marine v. Columbia Aventura Medical Ctr.*, No. 00-1845 (D.D.C.)
    - *U.S. ex rel. Parslow v. Columbia/HCA Healthcare Corp.*, No. 99-3338 (D.D.C.)
    - *U.S. ex rel. Lanni v. Curative Health Servs., Inc.*, No. 00-2584 (D.D.C.)

- The United States prosecuted HCA executives for conspiracy to defraud the government, although in 2002 the Eleventh Circuit Court of Appeals overturned the convictions of HCA executives Robert Whiteside and Jay Jarrell. *United States v. Whiteside*, 285 F.3d 1345, 2002 U.S. App. LEXIS 4610 (11th Cir. 2002).
- In 2000, HCA agreed to pay the United States $745 million related to allegations of numerous healthcare felonies.

11. HCA owns and, through its East Florida Division, operates the Kendall Healthcare Group, Limited, d/b/a Kendall Regional Medical Center.

12. HCA East Florida Division, Kendall Healthcare Group, Ltd., and Columbia Hospital Corp. of Kendall are mere instrumentalities of HCA.

13. The allegations herein against HCA are made against HCA and its instrumentalities. The actions of HCA's instrumentalities are the actions of HCA.

## II. The Law

### A. The Federal and Florida False Claims Acts

14. The federal False Claims Act ("FCA") prohibits the submission of false or fraudulent claims and false statements in order to obtain or keep federal money. It provides, in pertinent part:

> (1) Any person who (A) knowingly presents, or causes to be presented, to an officer, agent, contractor or employee of the United States Government of the United States a false or fraudulent claim for payment or approval; or (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> \* \* \*
>
> is liable to the United States Government for a civil penalty of not less than $5000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . ., plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a).

6

15. The Florida False Claims Act ("FFCA") prohibits the submission of false or fraudulent claims and false statements to state agencies in order to obtain or keep state money. It provides, in pertinent part:

> (2) Any person who:
>     (a) Knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval; or
>     (b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency;
>                              ***
> is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

Fla. Stat. Ann. § 68.082(2)

16. Both the FCA and the Florida FCA define "knowingly" as follows:

> (1) the terms "knowing" and "knowingly"
>     (A) mean that a person, with respect to information-- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and no proof of specific intent to defraud is required.

### B. Medicare and Medicaid

17. Medicare is a third- party reimbursement program that underwrites medical expenses of the elderly and the disabled. 42 U.S.C.§§ 1395 *et seq*. Medicaid is a medical assistance program for indigent and other needy people that is financed by joint federal and state funding and is administered by the states according to federal regulations, oversight, and enforcement. 42 U.S.C. §§ 1396 *et seq*.

18. The Medicare Act states that "no payment may be made . . . for any expenses incurred for items or services" that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). In addition, healthcare providers must ensure that services or items "will be

7

provided economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5.

19. The Secretary of Health and Human Services, through CMS, decides whether a particular medical service is "reasonable and necessary." CMS develops National Coverage Determinations (NCDs) to describe the circumstances for Medicare coverage nationwide for an item or service. 42 U.S.C. § 1395ff(f)(1)(B); Medicare Program Integrity Manual (MPIM) § 13.1.1.

20. In the absence of a national coverage determination, local Medicare contractors may issue a "local coverage determination" that announces whether or not a particular item or service is covered by that contractor. 42 U.S.C. § 1395ff(f)(2)(B). *See* 42 C.F.R. § 426.400 *et seq.* (regulating LCD review procedures).

21. When there is neither a National Coverage Determination or a local coverage determination, the Medicare Program Integrity Manual considers a service to be reasonable and necessary if the procedure is:

> • Safe and effective;
> • Not experimental or investigational . . .; and
> • Appropriate, including the duration and frequency that is considered appropriate for the item or service, in terms of whether it is:
> > ○ Furnished in accordance *with accepted standards of medical practice* for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member;
> > ○ …
> > ○ One that meets, *but does not exceed, the patient's medical need*; and
> > ○ At least as beneficial as an existing and available medically appropriate alternative.

Medicare Program Integrity Manual (MPIM) § 13.5.1 [emphasis supplied]; *see also id.* § 13.3 (incorporating § 13.5.1's definition of reasonable and necessary for individual claim determinations) and *see also* Medicare Benefit Policy Manual § 15.50.4.3 (explaining that

8

"reasonable and necessary" determinations are made "with reference to acceptable standards of medical practice").

22. CMS explicitly rejects the premise that:

- a doctor's subjective belief can determine medical necessity,
- acceptance by individual health care providers, or even a limited group of health care providers, indicate general acceptance by the medical community,

and consistently has ruled that no presumptive weight should be assigned to a treating physician's medical opinion in determining medical necessity. *See* CMS Ruling 93-1.[1]

### III. Defendants' Fraudulent Conduct

#### A. Improper Trauma Center Referrals and Unnecessary Procedures

23. Medicare offers disproportionate funding to hospitals with trauma centers. Hospitals with designated trauma centers can bill and collect for certain activation fees that are paid by both Medicare and private insurance companies. Those fees can be substantial, sometimes more than funding the trauma program itself. When a hospital becomes a designated trauma facility, it receives increased traffic from the emergency medical services agencies that already utilize the hospital's services. The "halo effect" also impacts the remainder of the hospital simply because the emergency department gets busier —inpatient beds are filled more quickly and regularly; there are significantly more higher-acuity patients so more X-rays needed, more laboratory tests ordered, and more patients requiring use of the hospital's rehabilitation facilities. General surgery referrals get busier; orthopedic referrals grow as does the volume in the operating rooms.[2]

---

[1] https://www.cms.gov/Medicare/Appeals-and-Grievances/OrgMedFFSAppeals/Downloads/HCFAR931v508.pdf

[2] https://www.beckershospitalreview.com/hospital-management-administration/side-effects-8-wide-reaching-benefits-of-becoming-a-trauma-center.html

9

24. Hospitals want to have Level 1 trauma centers because they can bill both for a facility fee and a trauma-activation fee, all reimbursed at a fairly good rate. This is especially true with defendant HCA.

> For-profit HCA, based in Nashville, has actively pursued that strategy over the past several years, opening Level 2 trauma units at some of its Florida hospitals. "They have a national initiative and now have trauma personnel at the division level helping their hospitals develop trauma centers," Bishop said.
>
> In a prepared statement, HCA said: "In many of our communities, there has been a significant need for trauma care. Patients in these circumstances have a much better chance of survival when they are given care in a designated trauma center within an hour of injury (the Golden Hour), and we are proud that our scale and efficiencies, which support caregivers in our affiliated trauma programs, help enable us to offer these lifesaving services."

http://www.modernhealthcare.com/article/20151128/MAGAZINE/311289988

> Tampa Bay Times has found that HCA trauma centers, as a group, are charging injured patients tens of thousands of dollars more than Florida's other trauma centers.
> HCA's cover charge goes as high as $33,000. The rest of the state's average: $6,754. Then, the company charges more than other hospitals for imaging scans, lab tests and drugs.

https://www.tampabay.com/news/health/how-hca-turned-trauma-into-a-money-maker/2169280

25. Since February 2016, Dr. Eastlick, a hand surgeon, takes one-week of *Hand Call* on a monthly basis at Kendall Regional Medical Center, an HCA Level 1 Trauma Center, where he treats patients with hand injuries.

26. Dr. Eastlick observed on numerous occasions that HCA improperly classified patients as "trauma patients" even though they did not meet the criteria for trauma patients.

27. For example, he has treated patients with fingertip injuries, lacerations, and simple fractures without associated other bodily injuries, improperly classified as "trauma patients."

10

28. Recently Dr. Eastlick treated a patient who had fallen onto his wrist. HCA classified this patient as a "trauma patient." In Dr. Eastlick's medical opinion, this patient was not a trauma patient because this was a low-impact injury suffered at home, without associated other injuries.

29. Dr. Eastlick has seen other patients, also misclassified as trauma patients, transferred from the Florida Keys, as well as South Florida, and the West Coast of Florida.

30. Dr. Eastlick's hand injury patients, who he believes should not have been classified as Trauma Patients, include the following [names redacted and provided to government]:

| | | | | | |
|---|---|---|---|---|---|
| AA | 06/25/17 | EY | 07/18/17 | MV | 07/17/17 |
| AA | 12/06/17 | FC | 01/01/18 | NP | 05/24/17 |
| AD | 05/25/18 | IB | 03/18/17 | RO | 03/20/17 |
| AR | 01/01/17 | JB | 11/04/17 | SJ | 10/06/16 |
| ED | 10/02/17 | JG | 02/22/17 | SW | 02/09/18 |
| EQ | 09/27/17 | LJ | 12/10/17 | WD | 01/01/17 |
| ER | 10/08/18 | MM | 08/31/16 | ZM | 12/29/16 |

31. The service dates from this sample show the fraud is not recent.

32. The misclassification, however, is not limited to patients requiring hand surgeries. Other specialized physicians have also treated patients fraudulently classified as trauma patients. As discussed below, this includes Drs. Ricardo Castrellon, M.D., Carlos Medina, M.D., and Gabriel Salloum, M.D.

33. Although Dr. Eastlick does not file Medicare claims on behalf of HCA, he and other specialized physicians, who have witnessed the same violations as Dr. Eastlick, examine and treat many patients who are over age 65 and, on information and belief, are Medicare beneficiaries.

34. Because the misclassification involves many surgical specialties, not just Dr. Eastlick's hand patients, he estimates that the number of misclassifications in the *hundreds* per year.

### B.   Improper Burn and Reconstructive Center Referrals and Procedures

35. Burn Centers of Florida, Inc. and Burn and Reconstructive Centers of America, LLC are collectively referred to as "BARCOA."

36. On information and belief, Burn and Reconstructive Centers of America, LLC (or related entities) contracts with HCA at various locations throughout the United States.

37. BARCOA and their agents perform more microvascular free tissue transfers/MVFTT than comparable plastic surgeons in the same communities. These include CPT codes:15756, 15757, 15758; 20955, 20956, 20962, 20969, 20970.

38. In the majority of cases, MVFTT procedures are not indicated because simpler, less costly treatment methods are available. BARCOA and HCA over-utilize lucrative MVFTT procedures when they are not medically necessary because they generate revenue through service fees and facility fees.

39. BARCOA and their agents perform more procedures, such as debridement and grafting, on their patients than other burn centers.

40. HCA East Florida uses its transfer center to direct patients away from community physicians and refers them to BARCOA physicians in the same facilities—even when BARCOA physicians are not on the on-call roster. This is a less economical (for the government) approach and does not benefit patients.

41. Dr. Carlos Medina, a surgeon specializing in plastic and burn surgery and a former BARCOA physician, reported that BARCOA physicians were performing unnecessary (multiple) surgeries on burn patients. He confirmed that this was done at the direction of the BARCOA head office. Dr. Medina said the HCA Transfer Center is bypassing community

plastic surgeons to send patients to BARCOA physicians. He also reported that he has noticed patients classified as Trauma Patients when they did not meet trauma patient criteria.

42. Board certified Plastic Surgeon, Ricardo Castrellon, M.D., is fellowship trained in Burn Surgery. Dr.Castrellon told Dr. Eastlick that, in his experience, the BARCOA physicians perform more burn-related surgeries on their patients than other plastic surgeons at comparable institutions and that BARCOA physicians at Kendall Regional Medical Center perform excessive numbers of MVFTT procedures. In contrast to the numbers reported by BARCOA, in the prior ten year period, Dr. Castrellon said he only had the necessity to perform two MVFTT procedures. Dr. Castrellon also reinterated Dr. Medina's assertion that the HCA Transfer Center bypasses community plastic surgeons to send patients to BARCOA physicians. He also reported that he has noticed patients classified as Trauma Patients when they did not meet the criteria for this. He explained this classification is at the behest of the BARCOA head office in Augusta, Georgia.

43. Plastic Surgeon, Gabriel Salloum, M.D., also stated that the HCA Transfer Center bypasses community plastic surgeons to send patients to BARCOA physicians. He reported that he has noticed patients classified as Trauma Patients when they did not meet the strict trauma patient criteria.

44. Dr. Eastlick has treated patients at HCA Kendall Regional Medical Center. He has observed patients classified as Trauma Patients who did not meet strict criteria for such classification. He has had first-hand experience with the HCA Transfer Center bypassing community surgeons to send patients to BARCOA physicians when it was not medically necessary.

45. In addition to the risks associated with subjecting patients to unnecessary surgical procedures, Defendants subject their patients to unnecessary risks of anesthesia required by medically unnecessary procedures. CMS recognizes risks associated with anesthesia. *See e.g.* § 482.52 Condition of participation: Anesthesia services, and 42 C.F.R. § 416.42(a) (requiring under Part C "[a] physician must examine the patient immediately before surgery *to evaluate the risk of anesthesia* and of the procedure to be performed").

46. The procedures also risk surgical complications, which are more likely in elderly patients, including:

- Heart attack or stroke;
- Infection and inflammation;
- Allergic reactions, with hives and itching and, occasionally, shortness of breath, fever, and shock (which may be treated with medications).
- Bleeding;
- Pain, swelling, and tenderness.

47. Further, patients are burdened with additional monitoring, medications, lab tests, etc.

48. It is not medically reasonable or necessary to risk patient harm by characterizing patients as trauma patients for financial gain.

49.

50. Dr. Eastlick also has firsthand knowledge of patients receiving MVFTT procedures by BARCOA physicians when simpler, less complicated, and less costly procedures were indicated.

51. On information and belief, BARCOA physicians at HCA Kendall Regional Medical Center refer a large number of their patients to Miami Dermatology and Laser Institute (MDALI). One of the principal physicians at MDALI, Kristin Z. Haushalter, is the wife of the HCA Kendall Regional Medical Center's CEO, Brandon Haushalter.

52. As a consequence of the unlawful referral arrangements between HCA and BARCOA, Medicare and Medicaid patients are undergoing excessive numbers of surgeries and excessive numbers of unnecessarily complicated surgeries.

### C. Defendants Filed or Caused The Filing of False Claims

53. HCA and its Kendall Regional Medical Center filed claims with the U.S. government.

54. Kendall Regional Medical Center has total patient revenue of about $3.7 billion, of which $377 million Medicare revenue is paid from the three top ZIP Codes surrounding it. [3]

55. HCA has submitted, and caused others to submit, to the federally sponsored health-care programs, including Medicare, TriCare, and Medicaid, false or fraudulent claims for reimbursement and records in support of such false claims for the services HCA provided to the beneficiaries of such federally sponsored health care programs that had been referred to HCA unlawfully.

56. HCA had knowledge or acted in reckless disregard of the falsity of these claims.

57. Defendant HCA, through HCA's wholly owned entities, has presented or caused to be presented these claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent.

58. HCA's long-history of paying fines, civil damages, and other penalties show that HCA has actual knowledge of the requirements of these statutes.

59. Burn Centers of Florida, Inc. and Burn and Reconstructive Centers of America, LLC, have submitted false claims in violation of the False Claims Act, or have knowingly and willfully made, used, or caused to be made or used, false records or statements which are material to the false or fraudulent claims paid or approved in violation of the False Claims Act.

---

[3] https://www.ahd.com/free_profile/100209/Kendall_Regional_Medical_Center/Miami/Florida/ Which reports Financial data for hospital cost report period ending 12/31/2017 (HCRIS 626575 - 2010). Medicare IPPS claims data are for federal fiscal year ending 09/30/2017 (Final rule MedPAR).

## IV. Counts

### A. Submission of False Claims, 31 U.S.C. § 3729(a)(1)(A)

Relator incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

60. Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, acting through the Medicare and Medicaid programs.

61. By virtue of the false or fraudulent claims presented or caused to be presented by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990. For violations occurring after November 2, 2015, the civil penalty for each claim is not less than $10,957 and not more than $21,916. 28 C.F.R. § 85.3(a)(9).

### B. Use of False Records of Statements, 31 U.S.C. § 3729(a)(1)(B)

Relator incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

62. Defendants knowingly made, used, and caused to be made or used, false records or statements to get false or fraudulent claims paid and approved by the United States for reimbursement.

63. By virtue of the false or fraudulent claims presented or caused to be presented by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990. For violations occurring after November 2, 2015, the civil penalty for each claim is not less than $10,957 and not more than $21,916. 28 C.F.R. § 85.3(a)(9).

      C.      **Submission of False Claims Under Florida FCA, FSA. § 68.082(2)(a)**

Relator incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

64.      This is a claim for treble damages and civil penalties under the Florida FCA, Fla. Stat. Ann. § 68.083(2).

65.      Defendants violated Fla. Stat. Ann. § 68.082(2)(a) by knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval to the State of Florida, acting through the Medicaid program, for reimbursement of medically unnecessary or unreasonable items or services.

66.      By reason of these payments, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

      D.      **Use of False Records or Statements, Fla. Stat. Ann. § 68.082(2)(b)**

Relators incorporate by reference all paragraphs of this complaint as if fully set forth herein.

67.      This is a claim for treble damages and civil penalties under the Florida FCA, Fla. Stat. Ann. § 68.083(2).

68.      Defendants violated Fla. Stat. Ann. § 68.082(2)(b) by knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim paid or approved by the State of Florida, acting through the Medicaid program, for reimbursement of medically unnecessary or unreasonable items or services.

69.      By reason of these payments, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

**Prayer for Relief**

70.      WHEREFORE, Relator requests that judgment be entered against Defendants, ordering:

  A.      Defendants pay the United States not less than $5,500 and not more than $11,000 (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990) for each

  violation of 31 U.S.C. § 3729 occurring before November 2, 2015, plus three times the amount of damages the United States has sustained;

B.  Defendants pay the United States not less than $10,957 and not more than $21,916 for each violation of 31 U.S.C. § 3729 occurring on or after November 2, 2015, plus three times the amount of damages the United States has sustained;

C.  Defendants pay the State of Florida not less than $5,500, and not more than the greater of $11,000 for each violation of Fla. Stat. Ann. § 68.082, plus three times the amount of Medicaid payments paid by the State of Florida;

D.  Relator be awarded the maximum relator's share allowable pursuant to 31 U.S.C. § 3730(d) and Fla. Stat. Ann. § 68.085;

E.  Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d), Fla. Stat. Ann. § 68.085(1)(c) or (2), and any other applicable law or regulation;

F.  The United States, the State of Florida, and Relator be awarded such other, further or different relief as the Court deems just and proper.

**Plaintiff request trial by jury.**

  Respectfully submitted

  /s/ Jonathan Kroner
  Law Office Jonathan Kroner
  FBN 328677
  300 S. Biscayne Blvd., Suite 3710
  Miami, Florida 33131
  305 310 6046
  jk@FloridaFalseClaim.com

  Attorney for *Qui Tam* Plaintiff